Case No.: 22-12316-E

_____

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

PERRY W. HODGES, AURORA CECILIA SCARPATI RIPALDA,
MARLENIS SANCHEZ, and PEDRO SANCHEZ,

Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

**On Appeal from the United States District Court,
Southern District of Florida, Miami Division**

_____

## APPELLANTS' INITIAL BRIEF

_____

HYRAM M. MONTERO
Fla. Bar No. 339660
hmontero@monterolaw.com
Montero Law Center
Attorneys for Plaintiffs/Appellants
100 S.E. 6th Street
Fort Lauderdale, Florida 33301
(954) 767-6500
(954) 766-2690 (facsimile)

DAVID C. RASH
Fla. Bar No. 977764
david@rashmueller.com
Rash Mueller, P.A.
Attorneys for Plaintiffs/Appellants
1655 North Commerce Parkway
Suite 303
Weston, Florida 33326
Tel. (954) 515-0072
Fax (954) 515-0073

**<u>PLAINTIFFS'/APPELLANTS' AMENDED CERTIFICATE</u>**
**<u>OF INTERESTED PERSONS AND CORPORATE DISCLOSURE</u>**
**<u>STATEMENT</u>**[1]

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, Plaintiffs/Appellants certify that the following persons may have an interest in the outcome of the case:

1) Alca Avionics, Inc., non-party who is a defendant in Case Nos. 2020-015158-CA-01 and 2020-015160-CA-25 (11th Jud. Cir. in and for Miami-Dade County, Fla.), cases filed by Plaintiffs/Appellants arising from the same aviation accident at issue in this appeal

2) Brown, Thomas M., Trial Attorney for Defendant/Appellee

3) Federal Aviation Administration, agency of the Defendant/Appellee whose conduct is at issue in this appeal

4) Fowler, Debra D., Trial Attorney for Defendant/Appellee

5) Gayles, Hon. Darrin P., United States District Judge, Southern District of Florida

6) Hodges, Perry W., as Personal Representative of the Estate of Nisha

---

[1] Three persons were added at Nos. 20, 21, and 25.

Case No. 22-12316-E
Perry Hodges v. USA

Sejwal, Plaintiff/Appellant

    7)     Hunt, Joseph H., Trial Attorney for Defendant/Appellee

    8)     Jaffe, Steven R., Mediator

    9)     Montero, Hyram M., Attorney for Plaintiffs/Appellants

    10)    Montero Law Center, Attorneys for Plaintiffs/Appellants

    11)    Mueller, Jeffrey D., Attorney for Plaintiffs/Appellants

    12)    Otazo-Reyes, Hon. Alicia M., United States Magistrate Judge, Southern District of Florida

    13)    Picciotti, Matthew C., Attorney for Defendant/Appellee

    14)    Preamble, Bradley J., Trial and Appellate Attorney for Defendant/Appellee

    15)    Rash, David C., Attorney for Plaintiffs/Appellants

    16)    Rash Mueller, Attorneys for Plaintiffs/Appellants

    17)    Sanchez, Marlenis, as Co-Personal Representative of the Estate of Jorge Sanchez, Plaintiff/Appellant

    18)    Sanchez, Pedro, as Co-Personal Representative of the Estate of Jorge Sanchez, Plaintiff/Appellant

Case No. 22-12316-E
Perry Hodges v. USA

19)    Scarpati Ripalda, Aurora Cecilia, as Personal Representative of the Estate of Carlo Alfredo Zanetti Scarpati, Plaintiff/Appellant

20)    Sejwal, Chotu, surviving father of Decedent, Nisha Sejwal

21)    Sejwal, Suresh, surviving mother of Decedent, Nisha Sejwal

22)    Slawson, III, Guice "Chip", Appellate Attorney for Defendant/Appellee

23)    United States of America, Defendant/Appellee

24)    Upchurch, Watson, White & Max, Mediator

25)    Zanetti  Peinado, Marco Alfredo, surviving father of Decedent, Carlo Alfredo Zanetti Scarpati

## <u>CORPORATE DISCLOSURE STATEMENT</u>

There are no parent corporations or publicly traded corporations that have an interest in the outcome of this case.

Case No. 22-12316-E
Perry Hodges v. USA

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument in this matter, as there are important issues concerning the scope of air traffic controllers' duties in different segments of airspace to be determined. This decision will impact air traffic controllers and pilots nationwide.

Case No. 22-12316-E
Perry Hodges v. USA

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS

      AND CORPORATE DISCLOSURE STATEMENT. . . . . . . . . . . . C-1 of 3

CORPORATE DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . . . . . . C-3 of 3

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF SUBJECT-MATTER

      AND APPELLATE JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Statement of the Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

      I.    The District Court Erred as a Matter of Law in Finding that

Case No. 22-12316-E
Perry Hodges v. USA

Defendant Did Not Owe or Breach Any Duty of Care. . . . . . . . . . 49

II.    The District Court Erred as a Matter of Law in Determining

That Defendant Was Not Negligent with Respect to the "Follow"

Instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

III.    The District Court's Finding that the Piper Seneca Was No

Longer in Communication with the Tamiami Tower After

Leaving Class D Airspace Was Clearly Erroneous. . . . . . . . . . . . 56

IV.    The District Court Erred as a Matter of Law on the Issue of

Proximate Cause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

V.    The District Court Erred as a Matter of Law by Considering

for Purposes of Defendant's Liability Evidence Pertaining Only

to the Pilots' Comparative Negligence, If Any. . . . . . . . . . . . . . . 58


CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

SERVICE LIST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

-iii-

Case No. 22-12316-E
Perry Hodges v. USA

## TABLE OF CITATIONS

**CASES**

*Abrisch v. United States*,

    359 F. Supp. 2d 1214 (M.D. Fla. 2004). . . . . . . . . . .  49, 50, 54, 57, 58, 59

*Bongiorno v. Americorp, Inc.*, 159 So. 3d 1027 (Fla. 5th DCA 2015).. . . . . . . . . 58

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).. . . . . . . . . . . . . . 46

*Cuozzo v. Ronan & Kunzl,Inc.*, 453 So. 2d 902 (Fla. 4th DCA 1984). . . . . . . . . 58

*Daley v. United States*, 792 F.2d 1081 (11th Cir. 1986). . . . . . . . . . . . . . . 46, 49

*Dickens v. United States*, 545 F.2d 886 (5th Cir. 1977). . . . . . . . . . . . . . . . . . . . 46

*Gardella v. United States*, Case No. 1:15-cv-242,

    Order (E.D. Va., Feb. 11, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Gill v. United States*, 429 F.2d 1072 (5th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . 49

*Knous v. United States*, 683 Fed. Appx. 859 (11th Cir. 2017). . . . . . . . . . . . . 45, 46

*Mena Catering, Inc. v. Scottsdale Ins. Co.*,

    512 F. Supp. 3d 1309 (S.D. Fla. 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Philadelphia Indemnity Ins. Co. v. Florida Memorial University*,

    307 F. Supp. 3d 1343 (S.D. Fla. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Case No. 22-12316-E
Perry Hodges v. USA

*Phillip Morris USA, Inc. v. Arnitz*, 933 So. 2d 693 (Fla. 2d DCA 2006). . . . . . . . 58

*\*Sexton v. United States*, 132 F. Supp. 2d 967 (M.D. Fla. 2000). . . . . . . . . . . 51, 55

*Spencer v. Specialty Foundry Products, Inc.*,

    953 F.3d 735 (11th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Travelers Indemnity Co. v. Garcia*, 497 F.3d 1218 (M.D. Fla. 2020). . . . . . . . . . 53

*\*Zinn v. United States,* 835 F. Supp. 2d 1280 (S.D. Fla. 2011). . . . . . . . . 49, 57, 58

**FEDERAL STATUTES**

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

28 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii, 49

28 U.S.C. §§ 2671-2680. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

**FEDERAL REGULATIONS**

14 C.F.R. § 91.113.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**FEDERAL RULES**

Fed. R. App. P. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

**OTHER AUTHORITIES**

Aeronautical Information Manual (October 12, 2017) (AIM). . . . . . . . . . . . . 37, 40

    AIM § 3-2-1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Case No. 22-12316-E
Perry Hodges v. USA

*Air Traffic Control Manual,  FAA Order JO 7110.65X

(October 12, 2017)(ATCM). . . .  9, 11, 12, 29, 43, 47, 49, 50, 51, 52, 54, 55

ATCM § 1-1-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 29

ATCM § 1-2-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*ATCM § 2-1-1. . . . . . . . . . . . . . . . . . . . . . . 12, 14, 18, 29-30, 50, 51, 54

*ATCM § 2-1-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 30, 51, 52

*ATCM § 2-1-6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19, 30, 51, 52

ATCM § 2-1-21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30, 52

ATCM § 3-1-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*ATCM § 3-1-9. . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 30, 33, 52, 53, 54

*ATCM § 3-8-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 55

Tamiami ATC Tower Facility Standard Operating Procedures, Order

TMB ATCT 7110.65V (July 15, 2017) (SOP). . . . . . . . . . . . . . . . 22, 27, 28

SOP § 3-4-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

SOP § 3-4-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

SOP § 4-4-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Case No. 22-12316-E
Perry Hodges v. USA

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This is an appeal from a Final Judgment entered on May 13, 2022 (DE 217), after a non-jury trial. Pursuant to Fed. R. App. P. 4(a)(1)(B)(i), Plaintiffs'/Appellants' Notice of Appeal was timely filed with the District Court on July 11, 2022 (DE 221). The District Court had subject matter jurisdiction to entertain this case pursuant to 28 U.S.C. § 1346(b)(1) and 28 U.S.C. §§ 2671-2680, as Plaintiffs/Appellants brought wrongful death actions against Defendant/Appellee, United States of America, pursuant to the Federal Tort Claims Act, alleging negligence based on the acts and omissions of air traffic controllers employed by the Federal Aviation Administration, an agency of Defendant/Appellee. This Court has appellate jurisdiction to entertain this appeal pursuant to 28 U.S.C. § 1291, as an appeal from a final decision of a district court.

Case No. 22-12316-E
Perry Hodges v. USA

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether the district court erred as a matter of law in concluding that the air traffic controllers employed by Defendant did not owe or breach any duty of care to the pilots of the two aircrafts in the mid-air collision?

2.      Whether the district court erred as a matter of law in determining that there was no negligence on the part of the Defendant's air traffic controller in issuing and not rescinding the "follow" instruction?

3.      Whether the court's determination that the Piper Seneca was no longer in communication with the Tamiami Tower after leaving Class D airspace was clearly erroneous?

4.      Whether the district court erred as a matter of law on the issue of proximate cause?

5.      Whether the district court erred as a matter of law by considering evidence relevant only to the comparative negligence, if any, of the pilots, in determining the liability of the Defendant?

-1-

Case No. 22-12316-E
Perry Hodges v. USA

## STATEMENT OF THE CASE

### A.    Procedural History

On July 17, 2018, there was a mid-air collision between an outbound Piper aircraft with registration number N16281, departing Miami Executive Airport, and an inbound Cessna aircraft with registration number N6428D[2], which resulted in the aircrafts crashing in the Everglades, in Miami-Dade County, Florida, and the deaths of all four persons on board the two aircrafts (DE 1[3], pp. 3-5, ¶¶ 11, 13-20, 27; DE 1 [Case No. 1:19-cv-22125], pp. 2-5, ¶¶ 12, 13, 15-21, 28; DE 1 [Case No. 1:19-cv-22610], pp. 2-5, ¶¶ 12, 13, 15-21, 28).

Four lawsuits were filed against Defendant on behalf of the estates of the decedents, in District Court Case Nos. 1:19-cv-21893, 1:19-cv-22125, 1:19-cv-22222, and 1:19-cv-22610.  The lawsuits alleged negligence on the part of air traffic controllers at Tamiami Airport Traffic Control Tower, who were employed by

---

[2] The Cessna that collided with the Piper aircraft will frequently be referred to in this Brief as the "inbound Cessna."

[3] All citations to the record will refer to docket entry numbers, page numbers, and, where applicable, paragraph numbers in the following format: (DE ___, pp. ___, ¶¶ ___).  Unless otherwise specified, all docket entry numbers pertain to Case No. 1:19-cv-21893.

-2-

Case No. 22-12316-E
Perry Hodges v. USA

Defendant through its agency, the Federal Aviation Administration (FAA).  (DE 1, pp.  2, 4-6, ¶¶ 8, 23-30; DE 1 [Case No. 1:19-cv-22125], pp. 2, 4-6, ¶¶ 9, 24-31; DE 1 [Case No. 1:19-cv-22610], pp. 2, 4-6, ¶¶ 9, 24-31).

The Defendant/Appellee filed Answers and Affirmative Defenses in the cases (DE 8; DE 6 [Case No. 1:19-cv-22125]; DE 12 [Case No. 1:19-cv-22222]; DE 7 [Case No. 1:19-cv-22610]).  Thereafter, the cases were consolidated pursuant to an Order dated August 7, 2019, which required all subsequent filings to be made solely in *Hodges v. USA,* Case No. 1:19-cv-21893 (DE 10).

Plaintiff Monica Domingues, the Personal Representative of the Estate of Ralph Knight, whose claims were set forth in Case No.1:19-cv-22222 prior to consolidation, settled her claims prior to trial in August 2020 (DE 60).

With regard to the claims of the remaining Plaintiffs, a non-jury trial was conducted over eleven days in August, October, and November of 2021 (DE 175, 176, 177, 178, 198, 199, 200, 201, 209, 210, 211).  The lower tribunal presented the parties its findings of fact and conclusions of law at a videoconference on May 13, 2022 (DE 218), and entered Final Judgment for the Defendant/Appellee the same day (DE 217).  Plaintiffs timely filed their Notice of Appeal on July 11, 2022 (DE 221).

Case No. 22-12316-E
Perry Hodges v. USA

**B.    Statement of the Facts**

*1.    Overview of the Parties and the Accident*

On July 17, 2018, at approximately 10:15 a.m. local time, the Cessna N6428D, a plane owned by Dean International Flight School, Inc. ("Dean"), departed from the Tamiami Airport on a student pilot training flight to Immokalee Regional Airport (DE 140, p. 7, ¶¶ V.A., B.).   After landing at the Immokalee Airport, this Cessna then departed at approximately 12:15 p.m. local time the same day to return to the Tamiami Airport (DE 140, p. 7, ¶ V.C.).   On board the Cessna were Jorge Sanchez, an FAA-certified flight instructor acting as the pilot-in-command, and Carlo Scarpati, a student pilot (DE 140, p. 7, ¶¶ V.D, E.).

Steven Yanker and Austin Frazao were air traffic controllers employed by the FAA and acting within the course and scope of their employment on July 17, 2018 (DE 140, p. 7, ¶ V.F.).   Mr. Yanker took over the Ground Control and Controller-in-Charge positions at 12:48 p.m. local time, while Mr. Frazao took over the Local Control North position at 12:50 p.m. local time (DE 140, p. 7,  ¶¶ V.H., I.).

The Piper Seneca N16281 (hereinafter "Seneca"), a plane also owned by Dean, departed from the Tamiami Airport at shortly after 12:52 p.m. local time (DE 140, p.

-4-

Case No. 22-12316-E
Perry Hodges v. USA

7, ¶ V.A.; DE 161-10, p. 4).    On board the Seneca were Nisha Sejwal, the pilot-in-command occupying the left seat, who had a private pilot certificate, and was an applicant for a commercial pilot certificate (DE 140, pp. 7-8, ¶¶ V.J., K.).  Occupying the right seat aboard the Seneca was Ralph Knight, an FAA Designated Pilot Examiner, who was administering to Ms. Sejwal her practical test for the commercial pilot certificate during the flight (DE 140, p. 8, ¶¶ V.L., M.).

The Seneca and the Cessna N6428D collided at 12:59:31 p.m. local time (DE 140, p. 8, ¶ V.R.).   The collision happened in Class E airspace, approximately 9.4 nautical miles northwest of the Tamiami Airport (DE 140, p. 8, ¶ V.S.).

Nisha Sejwal was 19 years old at the time of her death in the crash at issue (DE 211, pp. 91, 93). She is survived by her father, Chotu Sejwal, and her mother, Suresh Sejwal (DE 140, p. 9, ¶¶ V.V.,W.; DE 211, pp. 6, 100-101). The personal representative for the Decedent's estate is Perry Hodges (DE 140, p. 9, ¶¶ V.U.; DE 211, p. 192).

Carlo Alfredo Scarpati Zanetti was 22 years old at the time of his death in the crash at issue (DE 200, p. 31).  His mother, Aurora Cecelia Scarpati Ripalda, is the personal representative of his estate (DE 140, p. 9, ¶¶ V.X.; DE 200, pp. 42-43).  He

-5-

Case No. 22-12316-E
Perry Hodges v. USA

is also survived by his father, Marco Alfredo Zanetti Peinado (DE 140, p. 9, ¶¶ V.Y.;
DE 200, p. 30).

Jorge Sanchez was 22 years old when he died in the crash at issue (DE 200, pp.
8-9, 21). He is survived by his mother and father, Marlenis Sanchez and Pedro
Sanchez, who are the co-personal representatives of his estate (DE 140, p. 9, ¶¶ V.Z.,
AA.; DE 200, pp. 8-9, 20-21).

2.    *Background Concerning Tamiami Airport and Tower*

Tamiami Airport is ten miles southwest of Miami International Airport (DE
175, p. 160). Tamiami Airport, also known as Miami Executive Airport, is a facility
in which approximately two-thirds of the traffic is generated by aviation schools, and
in July of 2018, Dean was the largest of the aviation schools (DE 198, p. 6; DE 200,
p. 133). Controllers have recognized that the Tamiami Airport is an extension of the
classroom for students (DE 198, p. 42). In fact, Dean held mandatory monthly safety
meetings for its students in which the Tamiami air traffic controllers participated (DE
200, p. 104). There are locations northwest and southwest of Tamiami Airport called
"alert areas" where flight training was performed by the aviation schools (DE 198,
p. 7).

-6-

Case No. 22-12316-E
Perry Hodges v. USA

Aircraft are operated either under instrument flight rules (IFR) or visual flight rules (VFR), and the traffic at Tamiami is primarily VFR traffic (DE 176, pp. 51, 150; DE 177, p. 175).[4]   Both aircraft involved in this accident were operating as VFR aircraft, and the conditions on the date of the crash were suitable for VFR flight (DE 177, p. 143; DE 199, p. 119).

Within the Tamiami Air Traffic Control Tower there are distinct positions with different responsibilities (DE 158-11, p. 39, Defendant's Exhibit 98, Figure 34)[5]. The flight data and clearance delivery position receives the incoming information from pilots, including their tail sign/call number and what they want to do (e.g. whether they are leaving the airspace) (DE 178, p. 26). The person working this position does not have to see the plane being communicated with (DE 178, p. 27). The information received at this position is then transmitted to the second position, called ground control, which oversees the movement of aircraft on the field, the taxiways, where aircraft are taxiing toward or away from the runways (DE 178, pp.

_____

[4] There has to be three miles of visibility for VFR flying, whereas IFR flying allows the pilot to fly into clouds and to fly when there is less than three miles of visibility (DE 199, pp. 118-119).

[5] This exhibit is an illustration, not a photograph, of the tower positions (DE 178, pp. 25-26).

-7-

Case No. 22-12316-E
Perry Hodges v. USA

26, 27, 29). The person at ground control needs to see the aircraft being communicated with, so that they can see whether the instructions they are giving are being followed correctly, and this is accomplished by looking out the windows (DE 178, pp. 29-30). The local control positions, Local Control South and Local Control North, oversee takeoffs and landings on certain runways and certain portions of airspace, with Local Control South handling Runway 9 Right, and Local Control North handling Runway 9 Left (DE 178, p. 30).

When the flight data/clearance and delivery position receives information from a pilot, it creates a flight strip with that information (DE 178, p. 32). The flight strip is then moved to the ground control strip bay, a box where the strips are received (DE 178, p. 33). This informs ground control that the plane is ready to be taxied (DE 178, p. 33). If the plane is taxied to Runway 9 Right, Local Control South will receive the strip, and if the plane is taxied to Runway 9 Left, Local Control North will receive the strip (DE 178, pp. 34-35). The local controllers then focus on sequencing and spacing the aircraft for takeoff, and a strip is positioned differently after a plane is cleared for takeoff (DE 178, p. 35).

Flight strips were instituted at the Tamiami Airport because of the volume of

-8-

Case No. 22-12316-E
Perry Hodges v. USA

traffic being generated by Dean (DE 198, p. 8).   The flight strip procedures were

intended to reduce the workload at the Local Control North and Local Control South

positions (DE 198, p. 9).   This reduced workload would enable controllers to focus

on compliance with the Air Traffic Control Manual procedures (FAA Order 7110.65)

applicable nationwide (DE 198, pp. 9-10).   There is no rule specifying when VFR

flight strips are to be discarded (DE 177, p. 171; DE 175, p. 199).

There are 3 radar screens, also known as TDWs, in the Tamiami air traffic

control tower (DE 198, p. 40; DE 177, p. 118).   One screen is positioned at Local

Control North, another is positioned at Local Control South, and the third screen is

near the flight data position and  provides the same information as the screen at Local

Control North (DE 178, p. 62). The screens have been variously described as

approximately 14 inches, as 12 to 15 inches long by 12 to 15 inches wide, and as 15

inches by 13 inches with a 20 inch diagonal measurement (DE 198, pp. 46-47; DE

177, p. 109; DE 175, p. 120).  It is possible to view all four corners of the screen at

the same time (DE 177, p. 110).

A controller can use the screens while either sitting down or standing up (DE

177, p. 106).  The screens are movable up and down, right and left, within a five-foot

-9-

Case No. 22-12316-E
Perry Hodges v. USA

span (DE 177, pp. 104-105; DE 206-10, p. 1, Plaintiffs' Exhibit 56-B, Slide 6).   At

the center of the screen is the airport; there is an inner ring representing five miles

from the airport, and a second, wider ring representing 10 miles from the airport (DE

177, pp. 110-111; DE 175, pp. 63, 193-194; DE 206-10, p. 2, Plaintiffs' Exhibit 56-B,

Slide 7).   There is also a third, outermost ring, depicted with a weaker line, which

represents 15 miles from the airport (DE 175, pp. 63, 194; DE 206-10, p. 2).  The

scope setting on the radar screen at the time of the crash included the 15-mile ring

(DE 199, p. 217). While aircraft up to three miles away are visible out a window,

aircraft five miles away are possibly only visible via a radar screen, and aircraft ten

miles away are only visible on a radar screen (DE 177, p. 171).

There was no malfunction of the radar screens during the ten minutes prior to

the accident (DE 177, p. 123; DE 199, p. 216).  Pilots who regularly use Tamiami

Airport, including Dean students, would know that the facility was equipped with

radar (DE 199, p. 216).

Tamiami Airport is in Class D airspace.   Most witnesses described the Class

D airspace as defined by a 3.5 nautical mile radius from the center of Tamiami

Airport, though one witness referred to a five-mile radius for Class D airspace  (DE

-10-

Case No. 22-12316-E
Perry Hodges v. USA

175, p. 175; DE 201, pp. 141-142; DE 156-1, p. 15; DE 200, p. 153).  Witnesses also

differed to some extent in describing the vertical boundary of Class D airspace, with

one expert describing it as extending from the surface to an altitude of 1,900 feet (DE

175, p. 175), while another expert described the upper limit as extending to 2,000 feet

(DE DE 201, pp. 141-142; DE 156-1, p. 15).

    *3.    Testimony of Air Traffic Controllers on Duty*

**<u>Austin Frazao</u>**

    Austin Frazao became an air traffic controller in 1992, and worked at the

Tamiami facility from 2003 until his retirement 17 years later (DE 198, pp. 6, 96).

When Mr. Frazao was asked at his deposition whether he was a person who paid

close attention to details during his career, his answer was "not really." (DE 198, p.

13).  On the date and at the time of the crash at issue, Mr. Frazao was working as an

air traffic controller at Tamiami in the Local Control North position (DE 198, p. 8).

    Mr. Frazao was asked a series of questions concerning his understanding and

interpretation of the provisions of the Air Traffic Control Manual ("ATCM") (DE

206-5, Plaintiffs' Exhibit 20).[6]  Mr. Frazao recognized ATCM § 1-1-1, providing that

---

    [6] The Air Traffic Control Manual is FAA Order JO 7110.65X, with effective
date of October 12, 2017 (DE 206-5, p. 1).

-11-

controllers are to "exercise their best judgment" for situations not covered by the Manual (DE 198, p. 12; DE 206-5, p. 31). Mr. Frazao acknowledged that ATCM § 2-1-1(a) provides that the "primary purpose of the ATC system is to prevent a collision involving aircraft operating in the system," but understood aircraft to be in the system only if they are on frequency and in two-way communication with the air traffic controller (DE 198, pp. 33-34, 40-41, 60-61, 174; DE 206-5, p. 43). He acknowledged that ATCM § 1-2-1 provides no definition of "system," and that nothing in ATCM § 2-1-1(a) provides that planes must be in communication with the air traffic controllers to be in the system (DE 206-5, pp. 35, 43; DE 198, pp. 40-41, 175).

Mr. Frazao recognized that ATCM § 2-1-1(c) provided in part that the "ATC system must provide certain additional services to the extent permitted. The provision of additional services is not optional on the part of the controller, but rather required when the work situation permits." (DE 198, p. 35; DE 206-5, p. 43). He acknowledged that the factors enumerated in ATCM § 2-1-1(c) as to when provision of additional services may be precluded include volume of traffic, controller workload, and higher priority duties. (DE 198, p. 35; DE 206-5, p. 43). Frazao

Case No. 22-12316-E
Perry Hodges v. USA

testified that traffic advisories are an example of additional services (DE 198, p. 35).

Mr. Frazao acknowledged that ATCM § 2-1-2(a) provides that first priority must be given to separating aircraft and providing safety alerts, and that good judgment must be used to prioritize all other ATCM provisions based on the situation at hand (DE 198, pp. 35-36; DE 206-5, p. 43). He also was aware of the note to ATCM § 2-1-2(a) providing that "[t]hat action which is most critical from a safety standpoint is performed first." (DE 198, p. 37; DE 206-5, p. 43).

Mr. Frazao was aware of ATCM § 2-1-6, providing that a safety alert should be issued if the controller is "aware" that an aircraft is at a position/altitude that places it in "unsafe proximity" to another aircraft, and that this is a first priority duty under ATCM § 2-1-2(a) (DE 198, p. 37; DE 206-5, p. 46).

Mr. Frazao acknowledged that ATCM § 3-1-9(b) described the purposes for which certified radar displays, which were present at Tamiami, may be used (DE 198, pp. 89-90; DE 206-5, p. 115). He contended that all four purposes were applicable only within Class D airspace, even though he acknowledged that only ATCM § 3-1-9(b)(4) was expressly limited to the surface area/Class D airspace (DE 198, pp. 219-224). While a note to ATCM § 3-1-9(b) provided that local controllers must spend

-13-

Case No. 22-12316-E
Perry Hodges v. USA

the "majority" of their time to visually scanning the runway and local area, the note

did not require controllers to spend all their time doing so (DE 198, pp. 91, 225-226;

DE 206-5, p. 115).   Moreover, Mr. Frazao admitted that ATCM § 3-1-9(b) must be

read in conjunction with ATCM § 2-1-1, providing that the primary purpose of the

system is to prevent aircraft collisions (DE 198, pp.  91-92).

Mr. Frazao was presented with the radar replay of what was visible on his radar

screen at the Local Control North position on the date of the accident (DE 198, p. 15;

DE 207, Plaintiffs' Exhibit 129).[7]  Mr. Frazao relieved another controller at the Local

Control North position between 16:49:40 and 16:50:30 (DE 198, p. 15).[8]   At

16:50:33, Mr. Frazao cleared an outbound Cessna with registration number ADF9GC

for takeoff from Runway 9 Left, with approval for a left turn (DE 161-10, p. 4,

Defendant's Exhibit 167)[9].  Mr. Frazao's first communication with Ms. Sejwal, who

---

[7] Since Plaintiffs' Exhibit 129 was an audio/video exhibit, it was conventionally filed on a disc.

[8] This time, known as Zulu time or universal time, translated into an Eastern time four hours earlier, so the time was around ten minutes before 1 p.m. (DE 175, p. 63; DE 198, p. 16).

[9] Defendant's Exhibit 167 is the transcript of the audio transmissions of the Local Control North air traffic control position at the Tamiami Tower on July 17, 2018 (DE 161-10).

-14-

Case No. 22-12316-E
Perry Hodges v. USA

was the pilot of the outbound Seneca, was between 16:51:21 and 16:51:27, at which

time he directed her to Runway 9 Left and instructed her to wait (DE 198, p. 16).   At

16:52:15, Mr. Frazao gave Ms. Sejwal the instruction "left turn approved follow the

cessna runway niner left cleared for takeoff." (DE 161-10, p. 4).

Mr. Frazao testified that he knew that both the outbound Cessna and the

Seneca were not staying in the runway pattern[10] and were traveling in a northwest

direction (DE 198, pp. 18-21).   He knew that the Seneca was a faster aircraft than the

Cessna, and he expected it to pull back its power and slow down to follow the Cessna

(DE 198, p. 21).   He never told the Seneca to stop following the outbound Cessna

(DE 198, p. 21).   It is Mr. Frazao's expectation when he gives a follow instruction

that the pilot will follow only until they leave the pattern (DE 198, p. 118).   However,

Mr. Frazao admitted that the Seneca was the only plane that day to which he gave a

follow instruction that was not remaining in the pattern; the other aircrafts receiving

a follow instruction that day were remaining in the pattern (DE 198, p. 184).

---

[10] Staying in the pattern means doing runway work, where a plane does
either a touch and go, a full stop landing, or a stop and go; in the last of these, the
plane comes to a full stop on the runway, and then powers up and departs again
(DE 198, pp. 185-186).   In a touch and go maneuver, a plane touches down, rolls
out, and takes off again (DE 176, p. 68).

-15-

Case No. 22-12316-E
Perry Hodges v. USA

Between 16:53:04 and 16:53:10, Mr. Frazao instructed the outbound Cessna to make a left turn; this was the plane that the Seneca was instructed to follow (DE 198, p. 21; DE 161-10, p. 5). Mr. Frazao acknowledged that the Seneca complied with his instruction by making a left turn behind the outbound Cessna (DE 198, p. 23). Mr. Frazao agreed that as of 16:57:03, nearly five minutes after his follow instruction to the Seneca at 16:52:15, the Seneca had not moved ahead of the Cessna and remained in Class D airspace (DE 198, pp. 25-27). Mr. Frazao likewise admitted that during that nearly five-minute period, he had not deleted the follow instruction, he had not told the Seneca to change its frequency, and he had not otherwise communicated with the Seneca (DE 198, pp. 26-27, 28).

Mr. Frazao recognized that other air traffic controllers at Tamiami tell pilots in training to change their frequency, but he does not regard this as rising to the level of an established practice of air traffic controllers at Tamiami; moreover, he considers this practice inappropriate, and actively sought to discourage other controllers from this practice (DE 198, pp. 44-45).

At 16:57:13, the Seneca was two and a half miles beyond Class D airspace, and just passing the five-mile ring around Tamiami, and it was at that time that Mr. Frazao

-16-

Case No. 22-12316-E
Perry Hodges v. USA

tossed out the flight strips for the Seneca and the outbound Cessna it was following (DE 198, pp. 28, 29).  Depending on his workload, Mr. Frazao's general practice was to either throw away the strip when an aircraft departed Class D airspace, or to throw away the strip when the plane passed the five-mile ring (DE 198, p. 11).

There was a period of two minutes during which Mr. Frazao issued no transmissions, from 16:57:14 through 16:59:10 (DE 161-10, p. 7).  During that time period there were two conflict alerts involving other planes, one lasting 9 seconds and a second one lasting 38 seconds, but neither warranted a transmission by Mr. Frazao (DE 198, pp. 52-53).  One of the conflict alerts was from 16:57:30 to 16:57:39, and Mr. Frazao looked at his radar screen to check on it (DE 198, pp. 30-32).  There was also a conflict alert at around 16:58:24, and  Mr. Frazao looked at his radar screen for this one as well, just long enough to identify the planes in conflict and then look out the window to check on them (DE 198, pp. 46, 49).

Mr. Frazao answered questions about the radar replay at 16:58:48 (DE 198, p. 58).  At that point, the outbound Seneca and the inbound Cessna that later collided were about two and a half miles apart, with the Seneca traveling northwest and the Cessna traveling east (DE 198, p. 58).  At 16:58:48, Mr. Frazao was communicating

-17-

Case No. 22-12316-E
Perry Hodges v. USA

with five planes, three of which were in his area of Local Control North, and two of

which were in the Local Control South area (DE 198, pp. 62, 65). Mr. Frazao

considered his workload at that point to be a medium workload (DE 198, p. 66). Mr.

Frazao did not issue a traffic advisory to the Seneca at 16:58:48, but admitted that if

he had seen the situation developing between the outbound Seneca and inbound

Cessna at that time, he would have issued a traffic advisory to the Seneca (DE 198,

pp. 67, 68). He was not looking at the part of his radar screen where the Seneca

appeared because he was looking out the window, and focusing on what he

considered his higher priority duties of sequencing planes in the runway pattern (DE

198, pp. 68, 69).

In the context of the situation at 16:58:48, Mr. Frazao was asked again about

ATCM § 2-1-1(a), providing that the primary purpose of the ATC system is to

prevent collisions, and his interpretation that this provision only applied to aircrafts

on frequency and communicating with air traffic controllers (DE 198, pp. 60-62; DE

206-5, p. 43). Mr. Frazao acknowledged that he did not know at that point whether

the outbound Seneca or the outbound Cessna was on his frequency or not (DE 198,

pp. 61-62). He admitted that he had issued traffic advisories to aircrafts outside Class

-18-

Case No. 22-12316-E
Perry Hodges v. USA

D airspace in the past, in some instances even when he did not know a plane's call

sign/tail number, though he denied that he had issued safety alerts outside Class D

airspace (DE 198, pp. 59, 62, 222).

Looking at the radar replay at 16:59:09, the distance between the outbound

Seneca and the inbound Cessna was a mile and a half, and had he been looking at this

screen, he would have issued a traffic advisory (DE 198, pp. 53-55).   However, in

Mr. Frazao's view, a plane flying in the pattern and another plane that was awaiting

clearance for landing were higher priorities (DE 198, pp. 55-56).

Mr. Frazao recognized that the duty to provide safety alerts under ATCM § 2-

1-6 requires awareness, and that awareness is based on vigilance, which in turn

requires use of the tools supplied, including the radar display (DE 198, p. 70).  Mr.

Frazao issued no safety alerts to the Seneca between 16:58:48 and 16:59:14 (DE 198,

p. 71).

At 16:59:15, there was a transmission from an unidentified aircraft, indicating

that it was nine and a half miles northwest, and wished to land at the airport (DE 161-

10, p. 7; DE 198, p. 80).   Mr. Frazao admitted that the radar replay did not show any

other plane at that distance from the airport besides the inbound Cessna (DE 198, p.

-19-

Case No. 22-12316-E
Perry Hodges v. USA

81).    In response, he made a transmission at 16:59:24 that was neither a traffic advisory nor a safety alert (DE 198, pp. 81-82; DE 161-10, p. 7).

At 16:59:48, neither the Seneca nor the inbound Cessna were still on the radar screen, and Mr. Frazao had already reported to others that he had lost two planes (DE 198, p. 86).    Nonetheless, at 16:59:49, 17:00:08, and 17:00:26, Mr. Frazao made three attempts to contact the inbound plane (DE 198, pp. 87-88).    Additionally, at 17:00:31, Mr. Frazao attempted to contact the Seneca (DE 198, p. 89; DE 161-10, p. 8).

Notably, during the course of his shift prior to the crash, Mr. Frazao looked at radar several times.    At 16:51:45, he used a trackball entry to change the marker for a plane on his radar screen from white to blue, to indicate the aircraft was staying in the pattern (DE 198, pp. 17-18, 113).    At 16:52:36, he issued a transmission to a plane in the pattern that was preparing for a landing, and he thinks he looked at the TDW for that particular plane only (DE 198, pp. 123-124).    Between 16:54:25 to 16:54:50, he looked at the TDW to determine that a plane had left Class D airspace, and looked at one other plane on the TDW to mark it   (DE 198, pp. 133, 136).    Sometime between 16:54:50 and 16:55:50, he used the TDW to observe that one

-20-

Case No. 22-12316-E
Perry Hodges v. USA

plane did not have its transponder on, and also to check on the Seneca and the outbound Cessa it was following (DE 198, pp. 136, 138-139, 140). Between 16:56:20 and 16:56:38, he looked on the TDW to assist with spacing between two departing planes (DE 198, p. 143). Additionally, he issued a transmission to another plane at 16:56:55, and looked at the TDW to mark that plane blue (DE 198, p. 146). Sometime between 16:57:32 and 16:57:55, he looked at the TDW just to change the marker for a plane to blue as a reminder that it was staying in the pattern (DE 198, pp. 153-154). As previously mentioned, he also looked at the TDW for the two conflict alerts that arose during the approximately two minutes of silence shortly before the crash.

In hindsight, Mr. Frazao realized that nothing was more critical from a safety standpoint than the developing mid-air collision (DE 198, pp. 94-95). He admitted that on July 17, 2018, he made a choice not to look at the entire radar screen on the occasions he viewed it (DE 198, p. 94).

**Steven Yanker**

Steven Yanker was hired by the FAA and trained as an air traffic controller in 2010 has been an air traffic controller for approximately 12 years, and began working

-21-

Case No. 22-12316-E
Perry Hodges v. USA

at the Tamiami Airport in 2015 (DE 178, pp. 19, 24). On July 17, 2018, during the approximately ten-minute period before the accident, Mr. Yanker was working the Controller in Charge and Ground Control positions (DE 177, pp. 111-112). It was Mr. Yanker's understanding that when he was working both positions, that Ground Control duties had priority over Controller in Charge duties (DE 177, p. 129). However, he also acknowledged that the person occupying the Controller in Charge position is responsible for general supervision of the tower during that time, and he was paid extra during the time he is working that position (DE 177, pp. 113-114).

Mr. Yanker acknowledged that among the duties of a Controller in Charge under the Tamiami Tower's Standard Operating Procedures ("SOP"), Section 4-4-6(j), is "[m]aintaining situational awareness." (DE 177, pp. 116, 124; DE 156-1, p. 72, Defendant's Exhibit 23).[11] He admitted that TDWs can help maintain situational awareness (DE 177, p. 125).

Mr. Yanker learned of the mid-air collision when Mr. Frazao told him that two planes had just gone missing (DE 177, p. 130). At the time Mr. Yanker received this

---

[11] Defendant's Exhibit 23 (DE 156-1) is the Tamiami ATC Tower Standard Operating Procedures, and references to its provisions will be subsequently abbreviated in the following format: SOP § __).

Case No. 22-12316-E
Perry Hodges v. USA

information, he was looking out the window to assist the movement of planes on the

taxiway in his Ground Control capacity (DE 177, p. 130).    Upon receiving this

information from Mr. Frazao, Mr. Yanker contacted a supervisor (DE 177, p. 131).

Among the ATCM provisions discussed during Mr. Yanker's testimony was

ATCM § 2-1-21, which provides in part that "[u]nless an aircraft is operating within

Class A airspace or omission is requested by the pilot, issue traffic advisories to all

aircraft (IFR or VFR) on your frequency when, in your judgment, their proximity

may diminish to less than the applicable separation minima."  (DE 177, p. 142; DE

206-5, p. 52).    As far as Mr. Yanker knew, neither exception to the rule was

applicable (DE 177, pp. 142-143).    Mr. Yanker admitted that aircraft are free to

either leave or stay on frequency after they have left Class D airspace (DE 177, p.

147).  He also testified that the only way for a controller to determine whether an

aircraft is on frequency is to communicate with the aircraft, and in the absence of

communication, the controller has no idea whether the plane is on frequency or not

(DE 177, p. 177).

Mr. Yanker was asked to review clips from communications he had with pilots

-23-

Case No. 22-12316-E
Perry Hodges v. USA

earlier in the day on July 17, 2018 (DE 177, pp. 147-158).[12]    The first exchange

began with a pilot called in from approximately 10 miles from the Tamiami Airport

(DE 177, pp. 148-149).    Although Mr. Yanker did not hear the plane's call sign, he

responded with a safety alert relating to one aircraft in the vicinity, and a traffic alert

relating to another aircraft in the vicinity, and he directed the pilot to fly south (DE

177, pp. 149-154).  He was able to do this by using the TDW for position correlation

purposes, matching the position information provided by the pilot with information

from the TDW (DE 177, pp. 150-151).

    Mr. Yanker testified that while there is no two-way communication established

until an air traffic controller has the plane's call sign, it is still possible to exchange

communications back and forth and to issue transmissions amounting to safety alerts

and traffic advisories (DE 177, pp. 154-155).    When a traffic advisory is issued, the

potential for collision is not as imminent as when a safety alert is issued (DE 177, p.

152).    Moreover, Mr. Yanker acknowledged that he has issued traffic advisories to

aircrafts outside Class D airspace (DE 177, p. 158).

    During the two minutes before the crash, Mr. Yanker handled three departing

---

[12] This audio recording was Plaintiffs' Exhibit 50, a conventionally filed
exhibit (DE 176, p. 63; DE 207).

-24-

Case No. 22-12316-E
Perry Hodges v. USA

aircraft, sending two of them to Mr. Frazao, and monitored a fourth plane that was

taxiing back (DE 178, pp. 63-66).

### 4.    *Testimony of Dean International Flight School Employee*

Wesley Brady is the former assistant chief flight instructor at Dean, and that

was his position throughout his time at Dean (DE 200, pp. 99-100).   Dean owned and

operated both of the aircraft involved in the accident at issue (DE 200, pp. 99, 134).

The accident at issue occurred on July 17, 2018, and Dean closed its operations the

following day (DE 200, p. 134).

The Seneca involved in the accident was equipped with a Garmin 430W device

(DE 200, pp. 113-115).   A Traffic Information System (TIS) is a system that, if the

pilot is within a 30-mile radius of a major airport, will notify the pilot if other planes

are getting close to their aircraft (DE 200, p. 115).   The Garmin 430W has the ability

to display TIS information (DE 200, p. 116).   If an aircraft comes within two miles

of the pilot's aircraft, a traffic alert will arise; an auditory alert will sound, and a

visual alert will appear on the device's display (DE 200, pp. 116-117).   The screen

is a little bigger than a credit card (DE 200, p. 140).   Pilots are not supposed to

conduct maneuvers or take evasive action solely based on a TIS traffic alert; rather

Case No. 22-12316-E
Perry Hodges v. USA

they are supposed to visually locate the approaching aircraft before undertaking any

maneuvers (DE 200, p. 160).

Mr. Brady testified that he did not know what was displayed on the Garmin/TIS

device within the two minutes immediately before the crash (DE 200, pp. 140-141).

He does not know if the Garmin device was providing information during flight at

issue (DE 200, p. 148). Additionally, he did not discuss the Garmin equipment with

the people who flew the Seneca earlier that morning (DE 200, p. 148).

Mr. Brady acknowledged that for aircrafts leaving Tamiami Airport, there was

no requirement of the FAA, of the Federal Aviation Regulations, or of Dean that

pilots must change their frequency once they leave Class D airspace (DE 200, pp.

148-149).

    5.    *Testimony of Air Traffic Control Expert Witnesses*

**Richard Burgess**

Richard Burgess is Plaintiffs' air traffic control expert (DE 175, pp. 160-161).

He was employed by the FAA for approximately 30 years; he retired in 1994, and at

that time began working as an aviation consultant (DE 175, pp. 149, 150, 158).

At the Tamiami Airport, most of the traffic was generated by flight students,

Case No. 22-12316-E
Perry Hodges v. USA

and the majority of that in 2018 was generated by Dean (DE 175, p. 166). Flight students rarely question air traffic controllers' instructions, but seek to understand and comply with the instructions (DE 175, p. 168).

Mr. Burgess uses the phrase "radar service area" to refer to what is available on the air traffic controller's radar display (DE 175, p. 194; DE 176, p. 182). If a pilot calls in from that area, the controller is able to communicate with and identify the aircraft (DE 175, p. 194). While the screen could be adjusted so that only the five-mile ring would be visible, the settings should normally display both the 10-mile and 15-mile rings (DE 175, p. 194).

The Standard Operating Procedures followed by controllers at Tamiami include provisions concerning use of the radar screens, known as TDWs, an abbreviation for tower display workstations (DE 175, pp. 195-198; DE 156-1, pp. 20-21, Defendant's Exhibit 23). The TDW provides useful information for determining the position and distance of a plane from the airport, per SOP § 3-4-1 (DE 175, p. 196; DE 156-1, p. 20). Per SOP § 3-4-3, controllers are authorized to use the TDW to provide traffic advisories to aircraft, and the only distance limitation is what is visible on the display (DE 175, pp. 197, 198; DE 156-1, p. 20).

-27-

Case No. 22-12316-E
Perry Hodges v. USA

The Tamiami Standard Operating Procedures do not specify when VFR flight strips are to be discarded, so the controller must use good judgment (DE 175, p. 199). In this instance, discarding the flight strip was poor judgment on the part of Mr. Frazao, since he was eliminating one of his major tools for tracking a plane (DE 175, p. 200). Because Mr. Frazao had issued a follow instruction for the Seneca, he was responsible for that plane until he deleted the instruction (DE 175, pp. 200-201).

The issuance of the follow instruction and failure to delete the instruction were a deviation from the standard of care and a proximate cause of the collision, as the instruction forced the Seneca into a flight path east of the one that it would otherwise have taken, placing it in the path of traffic returning to Tamiami Airport (DE 175, pp. 201-202; DE 176, pp. 106-108, 137). When an air traffic controller at Tamiami has given a follow instruction to a departing aircraft heading northwest, until the instruction is deleted, the controller would expect the pilot to remain on frequency until he is out of the radar service area, which is approximately a 15-mile radius from the airport (DE 176, p. 14; DE 177, pp. 76, 90).[13] The collision at issue occurred

---

[13] Mr. Burgess acknowledged that he had not seen direct evidence, from examination of the wreckage, concerning what frequency the Seneca was on (DE 177, p. 51).

Case No. 22-12316-E
Perry Hodges v. USA

nine and a half miles from the Tamiami Airport, well within the radar service area (DE 176, p. 15).

During the course of his testimony, Mr. Burgess reviewed the audio recording of transmissions from the Local Control North position on the morning of July 17, 2018, between 13:44 and 14:52 UTC (DE 176, p. 63). The controller working the Local Control North position at that time was Mr. Yanker (DE 176, p. 64). The transmissions included transmissions with the same Seneca involved in the collision later in the day; in the morning the occupants were Ms. Sydney Solomon, who was on a commercial check ride with a designated pilot examiner, the same examiner on board during the mid-air collision (DE 176, pp. 63-64, 77). In these transmissions, the Seneca was not given a follow instruction, but instead was directed to pass another plane before making a northwest turn, and later was provided a frequency change (DE 176, pp. 73-75, 77).

Mr. Burgess testified that the Air Traffic Control Manual, Order 7110.65, is a requirement for all air traffic controllers nationwide, and its provisions are not optional (DE 176, pp. 44-45, 46-47). Among the ATCM rules that Mr. Burgess identified as important with respect to Mr. Frazao's duties were ATCM §§ 1-1-1, 2-

Case No. 22-12316-E
Perry Hodges v. USA

1-1(a), 2-1-1(c), 2-1-2, 2-1-21, 2-1-6, and 3-1-9 (DE 176, pp. 45, 47-51, 54-56, 111-114; DE 177, pp. 84-86). ATCM § 3-1-1, which states that controllers are supposed to "[p]rovide ... service based only upon observed or known traffic and airport conditions," contemplates that controllers will consider the traffic on their frequency, the flight strips, looking out the window, and using their radar displays in rendering service (DE 206-5, p. 111; DE 176, p. 56).   There is no particular sequence for use of these tools; the controller must do first whatever is most critical from a safety standpoint (DE 177, pp. 62-63).    Mr. Frazao's failure to follow FAA rules and procedures was a proximate cause of the accident (DE 176, p. 154).

Mr. Burgess would have given a traffic advisory to the outbound Seneca at 16:57:18, to let it know that there was traffic within six to seven miles to look for (DE 176, pp. 108-109; DE 177, pp. 32-33, 34-35, 76).   There were nearly two minutes with no transmissions from 16:57:13 to 16:59:10 (DE 176, p. 115; DE 161-10, p. 7). That silence in itself was evidence that Mr. Frazao's workload during that time was light and not complex (DE 177, p. 99).  During that time, traffic advisories should have been issued to the Seneca at 16:58:06, 16:58:24, 16:58:40, and 16:58:48 (DE 176, pp. 136-137; DE 177, p. 51).  Moreover, from 16:58:48 forward, if the Seneca

-30-

Case No. 22-12316-E
Perry Hodges v. USA

had responded that it did not see the traffic, then a safety alert would have been warranted because the planes were a mile or less apart (DE 176, p. 136).

The failures to issue the traffic advisories at the times through 16:58:48 amounted to a deviation from the standard of care, and were a proximate cause of the collision (DE 176, p. 138).   Additionally, the failure to issue a safety alert after 16:58:48 was a deviation from the standard of care that was a proximate cause of the collision; once planes are less than two miles apart a safety alert is required, as there is insufficient time for a pilot to respond to anything less than a safety alert (DE 176, p. 139).

At 16:59:11 Mr. Frazao issued a transmission to a plane in the pattern that was not at risk of collision (DE 176, pp. 115-116; DE 161-10, p. 7).   At that time, the outbound Seneca and the inbound Cessna were about a mile apart, and were both at an altitude of 1,400 feet; this was  the most critical situation at that time from a safety standpoint, and warranted a safety alert to the Seneca (DE 176, pp. 116-117).

**Darren Gaines**

Darren Gaines is Defendant's air traffic control expert (DE 201, p. 135).   He has been self-employed as a consultant since January 2018, and before that he was an

Case No. 22-12316-E
Perry Hodges v. USA

FAA air traffic controller for over 26 years through 2017 (DE 201, pp. 128, 129, 135).

In the view of Mr. Gaines, the dimensions of Class D airspace established the jurisdictional boundary of the services to be provided by the air traffic controllers, and noted that the accident occurred in Class E airspace (DE 201, p. 142).    When given the assignment of watching the radar replay, Mr. Gaines indicated that he would have issued a traffic advisory at 16:58:48 to the Seneca (DE 209, pp. 50-51). However, he qualified this answer by stating that unlike Mr. Frazao, he had no other tasks to do besides viewing the radar, that the testimonial setting created situational awareness, and that as a Tamiami controller he may not have seen the situation develop (DE 209, pp. 50-52).    Mr. Gaines testified that the TDW was the only way that this developing situation could be seen, as it was too distant to see with the naked eye or binoculars (DE 209, pp. 52-53).

Mr. Gaines contended that the follow instruction given by Mr. Frazao was warranted by ATCM § 3-8-1, which included a follow instruction among the prescribed phraseology to be used in sequencing and spacing aircraft (DE 201, pp. 171-172; DE 206-5, p. 143).  Mr. Gaines admitted that nothing in the text of ATCM

-32-

Case No. 22-12316-E
Perry Hodges v. USA

§ 3-8-1 limited the instruction to the traffic pattern (DE 209, pp. 127-128). Mr. Gaines concurred that within the time frame of the radar replay and the audio recordings of transmissions in evidence, no other aircraft was provided an instruction to follow that was not staying within the pattern (DE 209, p. 74).

Mr. Gaines also agreed that the note to ATCM § 3-1-9 provided that controllers are to spend the majority of their time, not all their time, observing traffic from the windows (DE 209, pp. 139, 141-142).

Mr. Gaines acknowledged that he had no evidence that the Seneca was ever off frequency or had changed frequency between its departure from Tamiami Airport and the collision (DE 209, p. 179). However, he also asserted that remaining on frequency did not entitle the Seneca to traffic advisories and safety alerts, because the plane was outside Class D airspace, and the evidence presented involving advisories given outside Class D airspace involved incoming aircraft, not departures (DE 209, p. 179).

Mr. Gaines acknowledged that in an after-accident report, Ernie Young, the manager of the Tamiami tower, described the volume and complexity of the traffic dealt with by Mr. Frazao as light (DE 209, pp. 183-186). Mr. Gaines disagreed with

-33-

Case No. 22-12316-E
Perry Hodges v. USA

Mr. Young's assessment, since it did not concur with that of the controller performing

the job (DE 209, p. 187).

      6.    *Testimony of Other Expert Witnesses*

**<u>Dr. Michael Crognale</u>**

      Dr. Michael Crognale is an expert in visual neuroscience, and testified for

Plaintiffs to address the defense that the pilots who died are responsible for the crash

because they did not exercise vigilance to see and avoid the crash[14] (DE 199, pp. 9-

10).

      Dr. Crognale's opinions were that under the circumstances of the case it would

have been very difficult for the pilots to see and avoid each other, even if performing

the recommended procedures, and that a timely alert from an air traffic controller

could have prevented or reduced the probability of the accident (DE 199, pp. 28-29).

He discussed the concept of uncertainty, that it is difficult to locate a plane if the pilot

does not know it is there, or does not know where in the sky it is, an uncertainty that

air traffic control information reduces (DE 199, p. 29).    Clear weather, such as was

---

      [14] The see and avoid concept derives from 14 C.F.R. § 91.113(b), which
provides that "vigilance shall be maintained by each person operating an aircraft
so as to see and avoid other aircraft." (DE 199, p. 33).

Case No. 22-12316-E
Perry Hodges v. USA

present at the time of the accident, can be a problem, because the contrast between the plane and the sky is reduced (DE 199, pp. 34-35).   Per FAA publications, it takes 12.5 seconds for a pilot to see and avoid another aircraft (DE 199, p. 46; DE 206-6, p. 3, Plaintiffs' Exhibit 24).   That time frame does not include the time to search for and find the aircraft; rather, it encompasses the time from the pilot's detection of the aircraft through the execution of the steps necessary to avoid a collision (DE 199, pp. 47-49).

Other limitations on the see and avoid concept are the high closure rate and the blossoming effect, where objects rapidly go from being too small to see to very large and unavoidable (DE 199, pp. 54-55).   Also, proximity of a target to high contrast edges or to the horizon makes an object difficult to see, while similarity to the background camouflages an object, also creating visual difficulty (DE 199, pp. 61-62).   These factors were at play in the instant case, such that there was a limited chance of the pilots successfully utilizing see and avoid, but timely guidance from air traffic control would have substantially reduced uncertainty and decreased the likelihood of a crash (DE 199, pp. 71-72).

-35-

Case No. 22-12316-E
Perry Hodges v. USA

**Benjie Coleman**

Benjie Coleman is Plaintiffs' piloting expert, and has 45 years of experience as a pilot (DE 199, pp. 117, 125). He has experience flying both models of planes involved in the crash at issue (DE 199, pp. 119-120).

Mr. Coleman testified that the air traffic controller had the last opportunity to prevent this crash by advising that there was traffic (DE 199, pp. 125-126). While pilots have an obligation to maintain vigilance to see and avoid other aircraft, air traffic controllers have a larger objective picture of the airspace (DE 199, pp. 128, 129).

The instruction to the Seneca to follow the outbound Cessna was a distraction, in that it required part of the pilot's focus to be on the outbound Cessna to maintain separation and not hit it (DE 199, p. 131). This challenge was compounded by the fact that the Seneca was a higher performance aircraft required to stay behind a lower performance aircraft (DE 199, pp. 131-132). This instruction created an additional workload for the pilot (DE 199, p. 148). Once the Seneca pilot received and acknowledged the instruction to follow, she was legally obligated to comply with it (DE 199, pp. 132-133). The instruction applied until the pilot was further advised

Case No. 22-12316-E
Perry Hodges v. USA

(DE 199, p. 157).

The Aeronautical Information Manual (AIM) provides guidance and rules for pilots (DE 199, p. 146; DE 206-4, Plaintiffs' Exhibit 18).  AIM § 3-2-1(a) indicates that Class E airspace is controlled airspace for both VFR and IFR flights (DE 199, p. 212; DE 206-4, p. 135).  AIM § 3-2-1(f) provides that safety alerts are a mandatory service to be provided by air traffic controllers to all aircraft, including when another plane is within an unsafe proximity (DE 199, pp. 212-213; DE 206-4, p. 135).

There is no rule that requires pilots to change frequency after leaving Class D airspace, and staying on frequency would help a pilot maintain vigilance, including by hearing conversations of incoming pilots (DE 199, pp. 148-149).  Mr. Coleman was not aware of any evidence that the Seneca pilot switched off the tower frequency (DE 199, p. 149).  Moreover, the instruction the pilot was given on departure was a reason to stay on frequency, and the pilot was never told to change the frequency (DE 199, p. 218).  From a pilot's standpoint, if the pilot is given an instruction to follow that is not deleted, and the pilot remains on frequency, the pilot is still in two-way communication with air traffic control (DE 199, pp. 218-219).

-37-

Case No. 22-12316-E
Perry Hodges v. USA

**Dr. Steven Morris**

Dr. Steven Morris is the Defendant's accident reconstruction expert (DE 201, p. 6). He has been performing accident reconstructions for over 21 years, and has done more than 200 reconstructions (DE 201, pp. 5-6).

Exactly three minutes passed between the Seneca's departure from Class D airspace and the crash, and two minutes and twenty-four seconds elapsed between the time the Seneca passed the five-mile ring and the crash (DE 201, p. 45). If the Seneca had changed its frequency, it would have had to occur during that 2:24 to three-minute period (DE 201, p. 47). Seven minutes and five seconds passed from the time of the Seneca's completion of its transmission (when it was indisputably on frequency) to the time of the crash (DE 201, p. 43).

After listening to audio recordings of local controller transmissions earlier in the day on the date of the accident, Dr. Morris acknowledged that multiple aircrafts, including the Seneca and the Cessna involved in the crash later in the day, received unsolicited instructions approving a frequency change after departure (DE 201, pp. 34-40; DE 207, Plaintiffs' Exhibit 50). Dr. Morris did not attempt to ascertain whether those unsolicited frequency change instructions were issued to the departing

-38-

Case No. 22-12316-E
Perry Hodges v. USA

pilots when they were inside or outside Class D airspace (DE 201, p. 41).

## Dr. Robert Hansman

Dr. Robert Hansman is an expert for Defendant on collision avoidance systems, such as the TIS (DE 201, pp. 60-61).   He has a doctorate from MIT, and was a professor at MIT of aeronautics and astronautics for 30 years (DE 201, p. 59).

Dr. Hansman opined that the Seneca aircraft was equipped with the Garmin 430 device, and that the device was functional on the date of the accident (DE 201, pp. 64, 71, 120).   Additionally, based on the radar information coming into the TIS from ground radar, the system's alert criteria would have been met at 16:58:50, and the alert would have activated on the next radar sweep, at 16:58:54, since the radar data is updated approximately every 4 seconds (DE 201, pp. 62, 77, 78, 83-84).   The criteria for an alert are that another airplane is expected to be within half a mile within the next 34 seconds (DE 201, p. 77).   The intent of these criteria are to afford the pilot 30 seconds to respond to the situation (DE 201, p. 84).

Dr. Hansman acknowledged that the dimensions of the Garmin display are 3.3 inches in width and 1.8 inches in height, which is smaller than a credit card (DE 201, p. 88).   He had no information that the individuals on board the Seneca would

-39-

Case No. 22-12316-E
Perry Hodges v. USA

disregard the information, either intentionally or otherwise (DE 201, p. 121). Dr.

Hansman admitted that TIS alerts are for situational awareness, and that a pilot should

not rely solely on TIS information for flight trajectory decisions, consistent with the

guidance from AIM and Garmin manuals (DE 201, pp. 105-106). Moreover, he

recognized that TIS is an informational system, not a command system, and does not

instruct the pilot to take specific evasive action, such as climbing, descending, or

turning (DE 201, p. 110). Air traffic controllers can issue commands (DE 201, pp.

110-111).

### Captain Brian Schiff

Captain Brian Schiff is the Defendant's piloting expert (DE 211, p. 21). He has

been an airline pilot for over 30 years, and also has experience flying smaller aircraft,

including the types involved in the accident at issue (DE 211, pp. 11, 14-15, 20).

His opinions are that both aircraft failed in their see and avoid responsibilities,

and that the Seneca pilots failed to properly respond to their on-board alert system

(DE 211, p. 22). Also, from a pilot's perspective, the actions of the air traffic

controllers were consistent with expectations (DE 211, p. 26). With respect to the

follow instruction given to the Seneca, in his view, a reasonable pilot would

-40-

Case No. 22-12316-E
Perry Hodges v. USA

understand that the instruction is in place only while the plane is in the traffic pattern, and that conclusion is based on "custom and practice" (DE 211, pp. 80-81, 116). However, Captain Schiff acknowledged that among the limited set of other transmissions he heard from the date of the accident, he did not hear any other aircraft that was not staying in the pattern receive a follow instruction (DE 211, pp. 174-175). He concurred that a pilot in training who is with a Designated Pilot Examiner is going to follow all instructions given, and he could not think of any instruction that Ms. Sejwal did not follow on the date of the accident (DE 211, pp. 179-180).

Captain Schiff acknowledged that he does not know whether the Seneca remained on the Tamiami Tower frequency after leaving Class D airspace (DE 211, pp. 108-109). He recognized that there is no requirement for a pilot to leave the frequency upon leaving Class D airspace (DE 211, p. 178). Captain Schiff also admitted that Tamiami controllers provide traffic advisories to aircraft outside Class D airspace (DE 211, pp. 134-135). He acknowledged that earlier on the morning of the accident, Tamiami controllers had issued transmissions where two-way communication had not yet been established (DE 211, pp. 135-138). Captain Schiff opined that it was possible that when Mr. Frazao's transmission ended 9 seconds

-41-

Case No. 22-12316-E
Perry Hodges v. USA

before the collision, that there was still time to avoid a collision (DE 211, p. 155).

He admitted that he does not know what Ms. Sejwal and Mr. Knight were doing in the minutes before the crash (DE 211, p. 147). His conclusion that the pilots failed to exercise vigilance to see and avoid other aircraft is based solely on the fact that a collision occurred (DE 211, p. 150). With respect to the issue of whether the Garmin TIS system was functional and operational, Captain Schiff testified that his recollection was that the person who flew the Seneca earlier in the morning had stated that the system was "unreliable," but he was not sure what she meant by that statement (DE 211, pp. 164-165).

## 8.    *The District Court's Findings of Fact and Conclusions of Law*

The district court noted that the Tamiami Airport is in Class D airspace, and that the mid-air collision occurred in Class E airspace (DE 218, pp. 4, 7). The court concluded that for this reason, the air traffic controllers "had no general duty to monitor" the Seneca and the inbound Cessna, despite evidence that Mr. Frazao had given traffic advisories to planes outside Class D airspace (DE 218, p. 8). The district court also held that there was no evidence that the air traffic controllers knew or should have known that the planes were likely to collide (DE 218, p. 8). First, the

-42-

Case No. 22-12316-E
Perry Hodges v. USA

court reasoned, the Seneca was outside the Tamiami airspace, and no longer had two-way communications with the air traffic controllers (DE 218, pp. 6-7, 8). Second, Mr. Frazao was not aware of the inbound Cessna until it sent a radio transmission approximately 15 seconds before the collision (DE 218, pp. 7, 8).

The court also found that there was no evidence that the air traffic controllers violated any specific rules or regulations of the FAA, Tamiami Airport, or the Air Traffic Control Manual (DE 218, p. 8). The court also acknowledged that the lack of specific rule violations, in itself, does not mean that negligence is absent (DE 218, p. 9).

The court next addressed Plaintiffs' assertion that the air traffic controllers were negligent because Mr. Frazao directed the Seneca to follow the outbound Cessna and failed to delete the instruction, placing the Seneca in the path of the inbound Cessna (DE 218, p. 9). The court found that there was disputed evidence between the experts as to whether a reasonable pilot would have followed that instruction indefinitely, and as to whether the Seneca had begun to pass the outbound Cessna before the collision with the inbound Cessna (DE 218, p. 9). Furthermore, the court found that "if Ms. Sejwal didn't know where the outbound Cessna was actually

Case No. 22-12316-E
Perry Hodges v. USA

going, it's simply not reasonable for me to believe that she would have simply

followed Mr. Frazao's instruction to say follow indefinitely outside the Class [D] ...

airspace." (DE 218, p. 9). The court found that this "general instruction to follow"

did not "deviate[] from the standard of care," and noted that it would have reached

the opposite conclusion had Mr. Frazao "given a specific instruction to follow to a

specific point ... and that caused an accident." (DE 218, p. 9). The court also did not

find that the instruction to follow "was the proximate cause of the collision." (DE

218, pp. 11-12).

    The court also did not find that the air traffic controllers were negligent in

failing to issue safety alerts or traffic advisories to the two planes despite their close

proximity because they were outside the Tamiami airspace, and Mr. Frazao was not

aware of the inbound Cessna until just before the collision (DE 218, p. 10). The

court noted that even if it accepted that "Mr. Frazao's responsibilities were light in

the two minutes prior to the collision," it could not "find, as a matter of law" that an

air traffic controller at a Class D airport "must review a TDW, a device that they are

not required to use, at any particular interval or for any particular length of time."

Case No. 22-12316-E
Perry Hodges v. USA

(DE 218, pp. 10-11).[15]

The court observed that there was "conflicting evidence about ... whether the pilot[s] should have been able to see and avoid one another." (DE 218, p. 11). Also, the court noted that it was "not clear from this record" whether the Garmin and TIS devices were "operational or used" by the pilots involved in the collision (DE 218, pp. 6, 12). At the same time, the court referred to testimony that there were no problems with the TIS on board the Seneca on an earlier flight on the date of the accident (DE 218, p. 12).

In short, the court found that the "air traffic controllers did not breach any duty of care and also, I find that the plaintiffs have not met their burden of showing that Mr. Frazao's conduct or the conduct of the other air traffic controllers was the proximate cause of the collision." (DE 218, p. 11).

## C.    Standard of Review

After a bench trial, the district court's conclusions of law are reviewed *de novo,* and its factual findings for clear error. *Knous v. United States*, 683 Fed. Appx. 859,

---

[15] The court also found that "the use of the tower radar display or TDWs are not mandatory and the air traffic controllers at Tamiami have no responsibility to track aircraft by radar." (DE 218, p. 5).

-45-

Case No. 22-12316-E
Perry Hodges v. USA

862 (11th Cir. 2017)(citation omitted).   A finding of fact is clearly erroneous where

although there is evidence to support it, on review of the entire record one is left with

the definite and firm conviction that a mistake has been committed.   *Dickens v.*

*United States*, 545 F.2d 886, 890 (5th Cir. 1977)[16](citation omitted).   The nature and

extent of the duty of care owed by air traffic controllers to pilots and their passengers

is a question of law.   *Knous*, 683 Fed. Appx. at 862; *Daley v. United States*, 792 F.2d

1081, 1085 (11th Cir. 1986)(citation omitted).   The court's application of the legal

standard of due care to the facts concerning negligence and causation is reviewed for

clear error.   *Knous*, 683 Fed. Appx. at 862; *Daley*, 792 F.2d at 1086 (citations

omitted).

---

[16] The Eleventh Circuit is bound by Fifth Circuit decisions issued on or before September 30, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

-46-

Case No. 22-12316-E
Perry Hodges v. USA

## SUMMARY OF THE ARGUMENT

The trial court erred as a matter of law in finding that the Defendant's air traffic controllers did not owe or breach any duties of care to the Plaintiffs. The district court erred by construing provisions of the Air Traffic Control Manual to contain restrictions on the airspace in which the duties were applicable, when such limitations were absent from the text of the Manual provisions. For the same reason, the district court erred as a matter of law when it determined that the "follow" instruction given by an traffic controller to the Seneca was not negligent.

The district court also erred as a matter of law by considering matters that pertained to the Plaintiffs' potential comparative negligence in determining the Defendant's liability. Likewise, the district court erred by determining that various matters were not "the" proximate cause of the crash and Plaintiffs' damages, when under Florida law Plaintiffs only needed to establish that a breach of duty was "a" proximate cause of the crash, in combination with other causes. Finally, the district court's determination that the Seneca aircraft was not in communication with air traffic controllers after leaving Class D airspace was clearly erroneous, when there was no evidence that the Seneca had left the Tamiami Tower's frequency after

-47-

Case No. 22-12316-E
Perry Hodges v. USA

departing Class D airspace.

For all these reasons, the Final Judgment in favor of Defendant should be reversed.

Case No. 22-12316-E
Perry Hodges v. USA

## <u>ARGUMENT</u>

**I.    The District Court Erred as a Matter of Law in Finding that Defendant Did Not Owe or Breach Any Duty of Care**

Certain general principles are relevant to whether the district court erred in its determinations concerning duty and breach of duty.  Under 28 U.S.C. § 1346(b), the tort liability of the United States is determined by the law of the place where the act or omission occurred, in this instance the law of Florida.  *Daley v. United States,* 792 F.2d 1081, 1085 & n. 12 (11th Cir. 1986).  The duty owed is Florida's standard of reasonable care, that which a reasonably careful person would use under the circumstances.  *Id*.

Moreover, while the duties of air traffic controllers set forth in the Air Traffic Control Manual (FAA Order 7110.65) are evidence of the standard of care in the industry, those duties are supplemented by the general duty of care under the circumstances.  *Abrisch v. United States*, 359 F. Supp. 2d 1214, 1226 (M.D. Fla. 2004); *Zinn v. United States,* 835 F. Supp. 2d 1280, 1312 (S.D. Fla. 2011); *see also Daley*, 792 F.2d at 1085 (assistance owed by air traffic controllers was required by USA's Air Traffic Control Manual); *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970) (government's duty of due care can "rest ... upon the requirements of

-49-

Case No. 22-12316-E
Perry Hodges v. USA

procedures manuals spelling out the functions of its air traffic controllers").

Additionally, "once they undertake to provide a service, even one not required by the Air Traffic Control Manual, under general negligence principles, air traffic controllers have a duty to provide such services with due care." *Abrisch*, 359 F. Supp. 2d at 1226.

With these principles in mind, the district court erred as a matter of law in finding that there was no general duty to monitor aircraft outside Class D airspace, no duty to issue traffic advisories and safety alerts outside Class D airspace, and no duty to use the TDW (DE 218, pp. 8, 10, 11).   The provisions of the Air Traffic Control Manual must be considered together.  *See Mena Catering, Inc. v. Scottsdale Ins. Co.*, 512 F. Supp. 3d 1309, 1315 (S.D. Fla. 2021) (contract terms should be read in their entirety, giving every provision its full meaning, and provisions should be read *in pari materia*); *Philadelphia Indemnity Ins. Co. v. Florida Memorial University*, 307 F. Supp. 3d 1343, 1347 (S.D. Fla. 2018) (pertinent provisions of contract are to be read *in pari materia*). Several provisions are of paramount importance. First, ATCM § 2-1-1(a), provides that the "primary purpose of the ATC system is to prevent a collision involving aircraft operating in the system." (DE 206-

-50-

Case No. 22-12316-E
Perry Hodges v. USA

5, p. 43). ATCM § 2-1-2(a) makes safety alerts a "first priority," and a note to ATCM

§ 2-1-2(a) states that "[t]hat action which is most critical from a safety standpoint is

performed first." (DE 206-5, p. 43). Under ATCM § 2-1-6 a safety alert should be

issued if an aircraft is at a position/altitude that places it in "unsafe proximity" to

another aircraft, and this is a "first priority" duty under ATCM § 2-1-2(a) (DE 206-5,

p. 46).

Precedent makes clear that ATCM provisions are not to be construed in an

unduly restrictive manner that is contrary to the overarching goal of safety reflected

in ATCM §§ 2-1-1, 2-1-2, and 2-1-6. In *Sexton v. United States*, 132 F. Supp. 2d

967, 984 (M.D. Fla. 2000), the government contended that the definition of safety

alert only encompassed collisions in the air, and that therefore the government had

no duty to alert a pilot that his plane was about to collide with another plane on the

ground. The court rejected this assertion, concluding that the FAA could not "hide

behind the technical definition of 'safety alert,' a term designed to promote safety."

*Id.*

In light of *Sexton,* if Manual provisions are not to be read restrictively to defeat

the general safety objective, then it is legal error to interpret Manual provisions to

Case No. 22-12316-E
Perry Hodges v. USA

contain restrictions that are absent from the text. Thus, the district court's conclusions effectively restricting the scope of Manual provisions to Class D airspace, when those provisions contained no such limitation, is contrary to the law. Indeed, at least one court has found that air traffic controllers owed duties of care to pilots who were in Class E airspace, as were the pilots in the instant case at the time of the crash. *See Gardella v. United States*, Case No. 1:15-cv-242, Order (E.D. Va., Feb. 11, 2016) (air traffic controllers owed duty of care under ATCM §§ 2-1-2, 2-1-6, and 2-1-21 to aircraft on VFR flight in Class E airspace)(DE 145-1, p. 11).

Perhaps the most significant example of the district court's error concerns ATCM § 3-1-9 (DE 206-5, p. 115). Section 3-1-9(b) identifies four uses of certified tower radar displays by local controllers. The first use is "[t]o determine an aircraft's identification, exact location, or spatial relationship to other aircraft." "To provide aircraft with radar traffic advisories" is the second purpose. Third, the controller may use TDW "[t]o provide a direction or suggested headings to VFR aircraft as a method for radar identification or as an advisory aid to navigation." Finally, the TDW may be employed "[t]o provide information and instructions to aircraft operating within the surface area for which the tower has responsibility." While

-52-

Case No. 22-12316-E
Perry Hodges v. USA

none of the prongs of ATCM § 3-1-9(b) specifically references any category of airspace, it could be argued that ATCM § 3-1-9(b)(4), by referring to the "surface area," limits the operation of this prong to the class of airspace in which the control tower happens to be located. Even if this limitation is accepted, it does not extend to the other three prongs of ATCM § 3-1-9(b).

A note to ATCM § 3-1-9(b) provides that "local controllers ... must devote the majority of their time to visually scanning the runways and local area." (DE 206-5, p. 115). Witnesses presented with this provision conceded that "majority of their time" does not mean all of their time (DE 198, pp. 91, 225-226; DE 209, pp. 139, 141-142). Indeed, a dictionary definition of "majority" is "a number or percentage equaling more than half of a total."[17] *See Spencer v. Specialty Foundry Products, Inc.*, 953 F.3d 735, 740 (11th Cir. 2020)(undefined statutory terms are given their ordinary meaning, and dictionaries can provide guidance); *Travelers Indemnity Co. v. Garcia*, 497 F.3d 1218, 1223 (M.D. Fla. 2020)(undefined contract terms should be given ordinary meaning, and dictionaries can help determine the meaning). Thus, ATCM § 3-1-9(b) enables air traffic controllers to spend substantial time looking at the TDW

---

[17] https://www.merriam-webster.com/dictionary/majority

Case No. 22-12316-E
Perry Hodges v. USA

as necessary to fulfill their duties, and Mr. Frazao conceded that ATCM § 3-1-9(b) should be read in conjunction with ATCM § 2-1-1, providing that the primary purpose of the system is to prevent aircraft collisions (DE 198, pp. 91-92).

Moreover, the record reflects that the air traffic controllers gave safety alerts and traffic advisories to aircrafts outside Class D airspace, and that controllers made significant use of the TDW screens. As noted above, the voluntary undertaking doctrine provides that once air traffic controllers have undertaken to perform a service, even one not required by the Manual, they must provide such services with due care. *Abrisch*, 359 F. Supp. 2d at 1226. In the instant case, having undertaken to provide services outside Class D airspace and to use the TDW in providing services, the Defendant's employees were required to exercise due care but failed to do so, resulting in the tragic accident at issue.

In view of the foregoing analysis, the district court erred as a matter of law in concluding that Defendant's air traffic controllers had no general duty to monitor aircraft outside Class D airspace, no duty to issue traffic advisories and safety alerts outside Class D airspace, and no duty to use the TDW.

-54-

Case No. 22-12316-E
Perry Hodges v. USA

## II. The District Court Erred as a Matter of Law in Determining That Defendant Was Not Negligent with Respect to the "Follow" Instruction

The district court erred as a matter of law in finding that it was not reasonable for Ms. Sejwal to continue to adhere to the follow instruction beyond Class D airspace (DE 218, p. 9), since this conclusion was contrary to the provisions of the Air Traffic Control Manual. ATCM § 3-8-1 includes a follow instruction among the prescribed phraseology to be used in sequencing and spacing aircraft (DE 206-5, p. 143). However, Mr. Gaines admitted that nothing in the text of ATCM § 3-8-1 limited the instruction to the traffic pattern (DE 209, pp. 127-128). In light of *Sexton*, *supra*, no such restriction should be construed to apply in the absence of textual support.

Thus, once Ms. Sejwal received the instruction, she was obligated to continue to adhere to it until further advised, as Mr. Coleman testified (DE 199, pp. 132-133, 157). At the same time, the issuance of this instruction was contrary to the usual practice at Tamiami Tower, since it was ordinarily issued only to aircraft staying within the pattern (DE 209, p. 74). As Mr. Burgess testified, the issuance of the follow instruction forced the Seneca into a flight path east of the one that it would

-55-

Case No. 22-12316-E
Perry Hodges v. USA

otherwise have taken, placing it in the path of traffic returning to Tamiami Airport,

and thus was a proximate cause of the accident (DE 175, pp. 201-202; DE 176, pp.

106-108, 137).   Accordingly, the district's legally erroneous conclusion about the

follow instruction warrants reversal.

**III.    The District Court's Finding that the Piper Seneca Was No Longer in Communication with the Tamiami Tower After Leaving Class D Airspace Was Clearly Erroneous**

The district court found that the  Seneca was no longer in communication with

the Tamiami Tower after leaving Class D airspace (DE 218, pp. 6-7, 8).  This finding

was inconsistent with the testimony of multiple expert and lay witnesses.  Mr. Frazao

and Captain Schiff both acknowledged that they do not know if the Seneca changed

its frequency after leaving Class D airspace (DE 198, pp. 61-62; DE 211, pp. 108-

109).   Likewise, Mr. Coleman and Mr. Gaines both recognized that there was no

evidence that the Seneca had changed frequencies or gone off the Tower frequency

(DE 199, p. 149; DE 209, p. 179).   Mr. Brady and Mr. Yanker both agreed that there

was no requirement that an aircraft leave the Tower frequency when departing Class

D airspace (DE 200, pp. 148-149; DE 177, pp. 147, 177).  Given this testimony, the

Case No. 22-12316-E
Perry Hodges v. USA

district court's finding was clearly erroneous.    This factual error is significant, because if the Seneca remained on frequency, it could have received and acted upon any timely traffic advisories or safety alerts that Defendant's employees should have given.  This factual error, as well as the district court's legal errors discussed above, warrants reversal.

## IV.    The District Court Erred as a Matter of Law on the Issue of Proximate Cause

"[C]ourts have found that an airplane crash can be legally caused by more than one proximate cause."  *Zinn*, 835 F. Supp. 2d at 1319.   Plaintiffs can meet their burden of proof even if they are unable to establish which of two possible causes of a crash was the actual cause of the crash.  *Id.*   This principle comports with Florida law, under which an actor's negligence can be a legal cause of damage even though it combines with some other cause in producing the harm.  *Id.* at 1319, 1327 (finding pilot 60% responsible, and FAA 40% responsible based on air traffic controller's breach of duty); *Abrisch*, 359 F. Supp. 2d at 1232-1233 (finding FAA air traffic controllers' negligence was the legal cause of 65% of the accident, while the pilot's

Case No. 22-12316-E
Perry Hodges v. USA

negligence was the legal cause of 35% of the accident).

The district court's opinion states six times that the standard applied was whether any particular action, conduct, or alleged breach of duty was "**the** proximate cause" of the collision (DE 218, pp. 8, 11, 12)(emphasis added). It was sufficient for Plaintiffs to establish that any particular action, conduct, or breach was "a" proximate cause of the collision, combined with other causes. *Zinn, Abrisch*, *supra*. The district court's application of the wrong standard warrants reversal.

## V.    The District Court Erred as a Matter of Law by Considering for Purposes of Defendant's Liability Evidence Pertaining Only to the Pilots' Comparative Negligence, If Any

Florida law provides that "[c]omparative negligence is an affirmative defense; thus, the party asserting the defense bears the burden of proving that the negligence of the other party was the cause of the accident." *Bongiorno v. Americorp, Inc.*, 159 So. 3d 1027, 1029 (Fla. 5th DCA 2015) (citing *Phillip Morris USA, Inc. v. Arnitz*, 933 So. 2d 693, 697 (Fla. 2d DCA 2006); *Cuozzo v. Ronan & Kunzl,Inc.*, 453 So. 2d 902, 903-04 (Fla. 4th DCA 1984)).

In the instant case, had the district court found that the Defendant owed and

-58-

Case No. 22-12316-E
Perry Hodges v. USA

breached a duty to the Plaintiffs, and that such breach was a proximate cause of the collision and Plaintiffs' damages, at that point, it would have been proper for the district court to consider whether there was comparative negligence on the part of the pilots. *See Abrisch*, 359 F. Supp. 2d at 1226-1233 (after analyzing and finding liability on the part of the air traffic controllers, court proceeded to analyze comparative negligence of pilot). Factual issues for the court to consider on comparative negligence would have included whether the pilots exercised vigilance to see and avoid other aircraft, and whether they received and appropriately responded to information from on-board TIS/Garmin equipment. However, the district court never reached the issue of comparative negligence, finding that Plaintiffs "bear the burden of proof," and had not met that burden on the issues of negligence and proximate cause (DE 218, p. 12). The fact that the district court nonetheless commented on the see and avoid and TIS/Garmin issues suggests that these issues were considered improperly and prematurely in addressing Defendant's liability (DE 218, pp. 6, 11, 12). Accordingly, reversal is warranted.

Case No. 22-12316-E
Perry Hodges v. USA

## **CONCLUSION**

For the foregoing reasons, Plaintiffs/Appellants respectfully request that this Court reverse the Final Judgment, and enter Final Judgment in their favor.    In the alternative, should the Court find it appropriate, Plaintiffs/Appellants respectfully request that the Court reverse the Final Judgment and remand for further proceedings in the district court.

Case No. 22-12316-E
Perry Hodges v. USA

Respectfully submitted,

MONTERO LAW CENTER
Attorneys for Plaintiffs/Appellants
100 S.E. 6th Street
Fort Lauderdale, Florida 33301
(954) 767-6500
(954) 766-2690 (facsimile)

By:/s/Hyram M. Montero
Hyram M. Montero, P.A.
Fla. Bar No. 339660
hmontero@monterolaw.com

RASH MUELLER, P.A.
Attorneys for Plaintiffs/Appellants
DAVID C. RASH, ESQ.
david@rashmueller.com
1655 North Commerce Parkway
Suite 303
Weston, Florida 33326
Tel. (954) 515-0072
Fax (954) 515-0073

By:/s/David C. Rash
David C. Rash, Esq.
Fla. Bar No. 977764

Case No. 22-12316-E
Perry Hodges v. USA

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains <u>12,831</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using WordPerfect X6 in 14 point Times New Roman font.

<u>/s/Hyram M. Montero</u>
Hyram M. Montero, P.A.

-62-

Case No. 22-12316-E
Perry Hodges v. USA

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that four copies of the foregoing brief were sent to

the Clerk of Court, 56 Forsyth Street, N.W., Atlanta, GA 30303, and that  the brief

was electronically filed with the Court and served on all counsel on the attached

Service List via the CM/ECF system, on this 21st day of September, 2022.

/s/Hyram M. Montero
Hyram M. Montero, P.A.

-63-

Case No. 22-12316-E
Perry Hodges v. USA

## SERVICE LIST

GUICE "CHIP" SLAWSON, III, ESQ.
BRADLEY J. PREAMBLE, ESQ.
U. S. Department of Justice
Civil Division, Torts Branch
Aviation, Space & Admiralty
Litigation
P.O. Box 14271
Washington, D.C.   20044-4271
Tel. (202) 616-4019 / 4112
Fax (202) 616-4159
Guice.Slawson.III@usdoj.gov
Bradley.j.preamble@usdoj.gov

*Attorneys for United States of America*

RASH MUELLER
DAVID C. RASH, ESQ.
JEFFREY D. MUELLER, ESQ.
david@rashmueller.com
jeff@rashmueller.com
1655 North Commerce Parkway
Suite 303
Weston, Florida 33326
Tel. (954) 515-0072
Fax (954) 515-0073

*Attorneys for Plaintiffs Aurora Cecilia Scarpati Ripalda, as Personal Representative of the Estate of Carlo Alfredo Zanetti Scarpati, deceased & Plaintiffs  Marlenis Sanchez and Pedro Sanchez, as Co-Personal Representatives of the Estate of Jorge Sanchez, deceased*

HYRAM M. MONTERO
hmontero@monterolaw.com
Montero Law Center
Attorneys for Plaintiffs/Appellants
100 S.E. 6th Street
Fort Lauderdale, Florida 33301
(954) 767-6500
(954) 766-2690 (facsimile)
*Attorneys for Plaintiff Perry W. Hodges, as Personal Representative of the Estate of Nisha Sejwal, deceased*

-64-